UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| Tina Lewallen, | § | Civil Action No. 1:05CV0733 |
|     Plaintiff, | § | |
| vs. | § | |
| | § | |
| The City of Beaumont, | § | |
|     Defendant. | § | **A Jury Is Demanded** |

**Plaintiff's Motion to Limit Testimony as Sanctions
for Failure to Cooperate in Discovery – Pursuant to Rule 37(d)**

The City has been very uncooperative in fulfilling its responsibilities under the discovery rules. At issue in this case is whether the plaintiff's gender is what kept her from succeeding for so long in securing a detective's position within the police department. The focus of the plaintiff's discovery has been to obtain complete knowledge of each detective's position that was filled during the applicable time period – the applicants, their histories with the department – and thus their weaknesses and strengths vis-a-vis one another, and whether male applicants were unlawfully favored over female applicants.

The first deposition the plaintiff noticed in this case was under Rule 30(b)(6) – and she asked the City to provide testimony regarding the relative qualifications and work histories of the applicants for ten specific openings for detectives so as to ascertain the City's rationale for each decision. Despite the fact that the City had four months in which to prepare its representative to provide this testimony, it did not do so. In fact, to date, the City has provided its rationale for only two positions the plaintiff was denied. To prevent trial by ambush, the plaintiff asks the Court to issue an order that limits the evidence the City can introduce regarding these other positions to what it provided the plaintiff in discovery – and preclude the City from offering any additional or contradictory evidence.

**The Fed. R. Civ. Pro. Rule 30(b)(6) Deposition**

A deposition pursuant to Fed. R. Civ. Pro. Rule 30(b)(6) is often the most efficient way for a party to obtain discovery from a corporate or governmental entity. The procedure provides advantages to both sides in litigation, as explained by the Advisory Committee to the Federal Rules. The Rule allows large entities the advantage of presenting only select individuals with relevant knowledge – instead of being saddled with multiple costly and time-consuming depositions. And, it protects the deposing parties from being "bandied" about amongst the entity's personnel trying to find the precise employee who has the necessary answers. *See* Fed. R. Civ. P. 30(b)(6) Advisory Committee notes to 1970 amendments.

While the rule "streamlines the discovery process," *Resolution Trust Corp. v. Southern Union Co., Inc.*, 985 F.2d 196, 197 (5th Cir. 1993) (*"RTC"*), the process cannot operate smoothly unless both parties do a little extra work. The deposing party must take care to specifically lay out in advance the issues to be discussed, a duty that is not required for other depositions. In turn, the party being deposed must carefully select at least one representative for each issue. The rule goes on to say, "the persons so designated shall testify as to matters known *or reasonably available* to the organization." FRCP 30(b)(6)(emphasis added).

In reading this obligation, it is well-settled that it means something more than simply presenting the representative for deposition.[1] The representative cannot come to the deposition

---

[1] *See, e.g., Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 433 (5th Cir. 2006); *Black Horse Lane Assoc., L.P. v. Dow Chem. Corp.*, 228 F.3d. 275, 304 (3rd Cir. 2000); *U.S. v. Taylor*, 166 F.R.D. 356, 360-361 (M.D. N.C. 1996), *aff'd*, 166 F.R.D. 367 ("The corporation then must not only produce such number of persons as will satisfy the request, but more importantly, prepare them so they may give complete, knowledgeable and binding answers on behalf of the corporation.")

equipped with only their personal knowledge – because it is more than their personal knowledge that will be explored. It is the knowledge of the organization that is necessary. Thus, it is essential to the process that the organization take steps to prepare its representative to speak vicariously for the organization. In other words, "The deponent must make a conscientious good-faith endeavor . . . to prepare those [representatives] in order that they can answer fully, completely, unevasively, the questions posed . . . as to the relevant subject matters." *Brazos River Authority v. GE Ionics*, 469 F.3d 416, 433 (5th Cir. 2006) (internal quotation marks and citations omitted) . Fed. R. Civ. Pro. 37 provides the Court with the authority to order such relief as is "just" when a party fails to cooperate in discovery. The City's non-cooperation at issue in this motion is its complete failure to provide a knowledgeably witness to testify about topics properly noticed for a Rule 30(b)(6) deposition of the City.

A party's duty to prepare its chosen representative with adequate knowledge is so paramount that the dereliction of that duty, according to the Fifth Circuit, is equivalent to a failure to appear. "If [the] agent is not knowledgeable about relevant facts, and the principal has failed to designate an available, knowledgeable, and readily identifiable witness, then the appearance is, for all practical purposes, no appearance at all." *RTC*, 985 F.2d at 197. It is as if the representative did not show up for the deposition at all. This is a "pragmatic interpretation" that has been followed by many courts.[2] As the Third Circuit aptly put it, "if a Rule 30(b)(6) witness is unable to give useful information, he is no more present for the deposition than would

---

[2] *Ferko v. NASCAR*, 218 F.R.D. 125, 143 (E.D. Tex. 2003) ("This circuit's pragmatic interpretation of the phrase 'fails...to appear' in Rule 37(d) has been met with approval by other courts."[citations omitted]) (collecting cases at fn 17).

be a deponent who physically appears for the deposition but sleeps through it." *Black Horse Lane Assoc., L.P., v. Dow Chemical Corp.*, 228 F.3d. 275, 304 (3rd Cir. 2000).

**Trying to Discover the City's Stated Rationale
for Selecting Male Applicants Over the Plaintiff**

The plaintiff applied for over 10 available detective positions after she became a specialist on April 3, 2000. While she was well-qualified for each position she sought, the City selected less-qualified male applicants over her. To learn the City's stated rationale for its selections, the plaintiff noticed a 30(b)(6) deposition – and stated that she wanted testimony regarding:

> The decision to deny the plaintiff the following positions; the names, qualifications, disciplinary history, IAD files regarding, seniority, previous work experiences and assignments within BPD, and the other information, if any, about each applicant that was considered by the decisionmaker(s) when selecting among the applicants for each position; the names of the individual chosen for each position; the names of the decisionmaker(s) as to who would fill each position:
>
> | | |
> |---|---|
> | 2000 | 3 positions in Narcotics |
> | 2002 | position in Street Crimes |
> | May 2003 | position in Family Violence |
> | October 2003 | position in Special Crimes |
> | December 2003 | position in Narcotics |
> | October 2004 | 2 positions in Property Crimes |
> | October 2004 | position in Special Crimes |

Ex. A at 2, 3. The City learned that it would be required to provide testimony about these selections on October 19, 2006, when the plaintiff first served the 30(b)(6) notice of deposition. Ex. B at 2, 3. The deposition ultimately took place on February 12-13, 2007. Ex. C at 1. The City thus had almost four months to gather the information to present during the deposition – and it never asked for additional time to prepare. *See also* Ex. C, p 91, line 23, thru p 92, line 9.

**The City's Testimony About Various Detective Positions Filled 2000-2004**

The City's designated representative for providing testimony on this topic was Assistant Chief Weldon Dunlap. Ex. C at 8. Dunlap's preparation for providing this testimony was limited to speaking with the City's counsel, reviewing the documents she provided him, and asking his assistant to locate some dates for him. Ex. C at 8-11, 115-117. That was it.

According to Dunlap, the City had had written guidelines since the mid-1990s as to how to choose between various officers all competing for the same detective position – but, the guidelines were not mandatory. Ex. C at 33-34. And, neither he nor the City provided training to the individuals who sat on the selection teams about how to use those guidelines. Id. at 35.

As the deposition proceeded, Dunlap revealed that he was not prepared to provide the detailed information the plaintiff sought about why the City selected who it did for each of these positions, each applicant's qualifications, the individuals involved in making each decision, or the criteria used to decide between competing applicants. He himself had no personal knowledge of the selections that were made, or the criteria that the members of each selection interview team applied. Ex. C at 90, lines 3-12. He knew only what he had read in the documents that the City's counsel had provided him. He was confident that all such documents had been located and produced. *Id*. at 91, line 8, thru 92, line 25.

With regard to the selection of a less-qualified male officer for a position in Narcotics in August 2001, for example, the City provided 37 pieces of paper, which was marked as Exhibit 6 to the FRCP 30(b)(6) deposition. Its witness provided no other information:

> Q.  Okay.  So, here is the limit of the documents that we got about a Jefferson County narcotics task force August '01. And let me ask you, looking at these, can you tell who was selected and what objective factors were looked at?

    A.  The only objective here is the individual applicant resumes I see.

    Q.  But we don't know what the deciders based their decisions on, right?

    A.  Right, not based on -

    Q.  Could have been purely objective, could have been purely subjective, it could be a combination thereof, right?

    A.  I can't testify one way or another.

Ex. C at 78, lines10-22. Similar responses were given to questions asked about other positions, as the chart beginning on the next page summarizes:

| | | | |
|---|---|---|---|
| Property May 2000 | Q: Are you prepared as a representative of the City of Beaumont today to tell me the qualifications, disciplinary history, IAD files, seniority, previous work experiences and assignments of the other -- of all of the applicants for that position? | A.  No more than what I can read off the paper here. | p. 52, lines 16-21 |
| | Q.  So, your testimony is that you did not do anything to attempt to find out this information that gave the city notice that I was going to ask about during this deposition? | A.  No more than what I was supplied with here because I don't know where to go to look for any additional information. | p. 53, line 21 thru p. 54, line 15 |
| | Q.  Seems like Lieutenant Wagner might have had some information about that, might he have? | A.  He may have. | |
| | Q.  IAD would know whether there were any IAD complaints on any of those people, right? | A.  Yes. | |
| | Q.  Somebody in the department would have to know if there was any disciplinary history on any of those people, right? | A.  Well, yes, but -- | |
| | Q.  And you didn't ask anybody in the department to get the IAD files, information about seniority or disciplinary history, et cetera, about the folks who applied for that job, did you? | A.  No, I did not. | p. 55, lines 2-6 |

| | | | |
|---|---|---|---|
| Property July 2000 | Q. As to the July, 2000, application can you tell who was selected? | A. It appears to be -- according to this Rick Boaz, Richard Boaz. | p 56, line 12 thru p 57, line 12 |
| | ...Q. As to Rick Boaz, can you -- do you know whether from looking at those papers or because you have personal knowledge what objective factors, if any, were considered in picking Rick Boaz over the other applicants? | A. No, ma'am. | |
| | ...Q. Aside from your recollection of having told your lieutenants that they need to abide by the law, do you know any evidence that tells us -- that tells us that that particular selection was not influenced by subjective racism, sexism, whatever? | A. Not to my knowledge. | |

| Property September 2000 | Q.  Okay.  This stack here pertains to the selection for the property crimes position in September of 2000.  There are four names on the front piece of paper in somebody's handwriting, but then comments about them off to the right margin.  Can you tell me whose handwriting is on that document? | A.  No. | p 57, lines 18-24 |
|---|---|---|---|
| | ...Q.  Of those four applicants, who was chosen? | A.  I really don't know unless there is some -- unless there is some paperwork here. | p 60, line 4 thru  p 61, line 6 |
| | Q.  You are welcome to look at it. | ...A.  There is nothing in here that supports or indicates who got it, but I was told who got it. | |
| | Q.  Okay.  You were told by whom? | A.  Kyle Thomas. | |
| | Q.  All right.  And what were you told by counsel for the city? | A.  That it was Randy Stevens that got it. | |
| | Q.  Okay.  Did you see any paper paperwork in there that showed the objective criteria, if there was any, on which Randy was selected? | A.  Well, his resume. | |
| | Q.  Okay.  I wanted to know if you can tell what the raters actually used.  Is there any document in which the raters show the objective information, if any, on which they relied in making their decision? | A.  It's my assumption that this was the criteria that they used. | |

| | | | |
|---|---|---|---|
| Special Crimes November 2000 | Q: Here is the packet of papers given to me this morning about an opening in special crimes in CID in November of 2000. Would you agree with me that there is nothing in this document to show us that the selection was made based on objective criteria and comparison of one to the other? | A: I don't see anything that's objective in here. This is just a list of the interview questions and individual interviewer's notes. | p 80, lines 17-24 |
| Auto Theft Task Force 2000 | Q.  All right.  These are documents that were together about a position in auto theft task force in 2000.  Can you tell from any paper in here what factors the raters considered when deciding who to award that position to? ...Is there a piece of paper in there that tells us what factors these people relied on?<br><br>Q.  Would you agree that when there is no objective basis for the rating that subjective opinions can come in and influence the decision?<br><br>Q.  And that subjective opinions can include racism or sexism? | A.  No, no single piece.<br><br><br><br><br><br><br><br>A.  It's possible.<br><br><br><br><br>A.  It's possible. | p 62, line 14 thru p 63, line 5 |
| Special Crimes 2001 | Q.  Here is the -- here are the documents I was given for an opening in special crimes unit in 2001.  Can you tell from looking at these papers who was in selected?<br><br>Q.  And can you tell from those papers what factors were considered in making a decision?<br><br>...Q.  The decision could have been influenced by subjective information like sexism or racism? | A.  I cannot tell.<br><br><br><br><br><br>A.  No more than the questions and the documents that are here support that.<br><br>A.  Right, could have, possible. | p 63, lines 6-22 |

| Narcotics Task Force Aug 2001 | Q. ...Looking at this stack of papers, can you tell what objective factors, if any, led the interview team to make the decision that it made?<br><br>Q. So, again, the outcome of this could be based on their subjective assessments and could be influenced by racism or sexism? | A. This appears to be only the questions, and I can't, I can't point to what was used objectively, subjectively.<br><br>A. Based on this, I have no -- I couldn't say yes or no. It's just back to the trust. Based on this, you can't tell how it was done, based on the paperwork there. | P 79, lines 2-12 |
|---|---|---|---|
| Property 2001 | Q. Here is the paperwork I was given for an opening in property in 2001. Can you tell me who made the selection and on what objective information, if any, it was based?<br><br>Q. But you have no idea what they based their decision on?<br><br>Q. You don't even know who was on that team, that interview team, do you? | A. The only objective thing I see is some resumes.<br><br><br><br>A. I do not, not in entirety.<br><br>A. I don't think -- I don't think it showed anything here as to -- let me check a couple of e-mails here. I don't see any -- any list of the interviewers. | p 80, lines 5-16 |

| | | | |
|---|---|---|---|
| Street Crimes May 2002 | Q. This is a package of information I received from your counsel this morning about an opening in street crimes in CID in May of 2002. My question is going to be, again, there is nothing in there that can tell us any objective factors on which this selection decision was made, is there? | A. The only objective thing that I see in here is resumes, but nothing else. | p 80, line 25 thru p 81, line 17 |
| | Q. And, so, that decision, just like all the others, could have been based on subjective criteria like racism or sexism without any objective rating criteria that's adhered to. You are allowing all this subjectivity to come in, right? | A. I can't say that the amount and the illegal subjectivity that you are talking about prevailed or not, but this is, again, as all of these is a trust in the folks that are overseeing it that that is not so. But as far as documentation here to support, I don't see it. | |
| | Q. Where is the proof that these particular decisions were made based on objective factors and that subjective factors like racism and sexism didn't enter the picture? | A. Well, you don't -- we don't have it here.. | p 82, lines 1-4 |
| Street Crimes August 2002 | Q. Again, you cannot tell from looking at these documents, can you, what criteria were applied to the various applicants? | A. These are just like I previously said, resumes and training. | p 84, line 24 thru p 85, line 5 |
| | Q. And we don't know what criteria the team considered? | A. Right, other than that, only that's shown. | |

| Narcotics August 2002 | Q: Here is the document I received for a position in the Jefferson County narcotics task force, August of '02. Same question, we can't tell from looking at those documents, can we, what the criteria were in evaluating the various applicants, can we? | A: Also, these are just resumes. Can't tell, subjective, objective – criteria. | p. 84, lines 6-14 |
|---|---|---|---|
| Property August 2002 | Q: And the same is true for the documents that we received about a vacancy in the property unit in CID in August of 2002; is that right? | A: Resumes and looks like an evaluation. I can't tell what else was used. | p. 84, lines 15-19 |
| Property November 2002 | Q: These appear to be documents related to a position in the property unit, November of '02. Same question, we can't tell from this what the selection committee based their decision on, can we? | A: Not beyond what is here. | p. 84, line 25 thru p. 86, line 4 |
| Family Violence May 2003 | Q. Do you see in that document what objective criteria that committee actually used to screen out 17 of the 19 people, not what they may have used but what they actually used? | A. I don't know what they actually used. | p 88, lines10-14 |

| Special Crimes November 2003 | Q: [C]an we assume that this document was intended to reflect what information the panel had in front of them when they made their decision? | A.  An assumption could be made. | P. 121, line 24, thru p. 122, line 20 |
| --- | --- | --- | --- |
| | Q.  Is there any other reasonable assumption that you can make from this document? | A.  I can't think of one. | |
| | Q.  If Lance Tiner was the only one of these three individuals asked to state his own opinion as to whether he was self-motivated, good at teamwork or enthusiastic, do you think that was giving an equal chance to the two female applicants? | A.  Well, no, not if that's what happened. | |
| | Q.  If -- can you think of any good reason why Trina Warden's and Tina Lewallen's answers to those same questions, if they were asked them, would not be included in this document? | A.  And that I don't -- I didn't make the document, and I don't know why. | |
| | Q.  Can you think of any good reason why that wouldn't be on here? | A.  I can't. | |
| | Q.  Can you sitting here today point to anything in these interview notes that would show that Lance Tiner gave the best answers and responses to questions? | A.  I can't make that -- I can't make that decision based on these notes. | p. 129, line 14 thru p. 130, line 7 |

Dunlap did not testify that the selections made for these decisions were not influenced by the unlawful motive of sexism.

> Q.  Looking at this stack of papers, can you tell what objective factors, if any, led the interview team to make the decision that it made?

14

>   A.  This appears to be only the questions, and I can't, I can't point to what was used objectively, subjectively.
>
>   Q.  So, again, the outcome of this could be based on their subjective assessments and could be influenced by racism or sexism?
>
>   A.  Based on this, I have no -- I couldn't say yes or no.  It's just back to the trust.  Based on this, you can't tell how it was done, based on the paperwork there.

Ex. C at 79, lines 2-12. In fact, with regard to all the selections for the open detective positions, Dunlap admitted that the only "evidence" he had that sexism had not entered into the selection process was his "trust" in his subordinates:

>   Q.  And, so, that decision, just like all the others, could have been based on subjective criteria like racism or sexism without any objective rating criteria that's adhered to.  You are allowing all this subjectivity to come in, right?
>
>   A.  I can't say that the amount and the illegal subjectivity that you are talking about prevailed or not, but this is, again, as all of these is a trust in the folks that are overseeing it that that is not so.  But as far as documentation here to support, I don't see it.

*Id.* at 81, lines 8-17.

## The Requested Sanction

The plaintiff asks that the Court rule that the City is not allowed, by testimony or otherwise, to present any evidence regarding the specifics as to why the City selected who it did to fill the detective positions discussed in the 30(b)(6) notice of deposition – other than the evidence presented by Dunlap in the 30(b)(6) deposition.[3]

---

[3] While the City did not identify Detective Sheila Barton as a person with knowledge of relevant facts who it might call to testify, the plaintiff did take her deposition, and that of Sgt. Ky Brown. To the extent that these individuals provided testimony about a selection decision that Dunlap did not provide, the plaintiff does not seek to exclude their testimony.

**Legal Authority for the Sanctions Requested**

In dealing with deficient 30(b)(6) deposition behavior, numerous courts have affirmed or imposed the following sanctions:

- precluding an affidavit that contradicts the 30(b)(6) testimony. *Rainey v. American Forest & Paper Ass'n*, 26 F.Supp.2d 82, 95-96 (D. D.C. 1998);
- precluding a corporation from submitting evidence at trial that contradicts the "I don't know" testimony given at the deposition. *Ierardi v. Lorillard, Inc.*, 1991 U.S. Dist. LEXIS 11320 at *8-9 (E.D. Pa. 1991);

- precluding two witnesses from testifying at trial because they were not presented for the deposition. *Reilly v. Natwest Mkts. Group Inc.*, 181 F.3d 253, 269 (2nd Cir. 1999);

- precluding a corporation from asserting a position and introducing evidence contrary to the position asserted during the deposition, plus awarding associated costs and attorney's fees. *Black Horse Lane Assoc.*, 228 F.3d. at 299-300;

- precluding a corporation from introducing further evidence regarding their counterclaims because the representative failed to provide any information that could form the basis of those claims. *Constellation NewEnergy, Inc. v. Powerweb, Inc.*, 2004 U.S. Dist. LEXIS 15865 at *17-18 (E.D. Pa. 2004);

- dismissing the claims of a party who failed to present any representative for deposition *Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.*, 2007 U.S. App. LEXIS 19015 (10th Cir. 2007).[4]

**Conclusion**

The plaintiff suggests sanctions that are appropriate to the nature of the defendant's discovery dispute, and that coincide with the type of information she was denied in discovery – due to the defendant's own willful failure and refusal to abide by its obligations under the

---

[4] *See Also Int'l Ass'n of Machinists & Aero. Workers v Werner-Matsuda* 390 F.Supp.2d 479 (D. Md. 2005) (willing to impose preclusion of subsequent evidence but dismissal of federal claims on other grounds made it unnecessary); *Taylor*, *supra* (corporation had yet to designate a representative, implying they had no corporate knowledge, if the corporation failed to do so they would not be allowed to introduce evidence that contradicts a lack of knowledge without a showing of "extremely good cause.")

Federal Rules of Civil Procedure. The plaintiff thus requests two additional forms of sanctions: (1) that the jury be instructed that the Court finds that the City intentionally withheld documents from the plaintiff, and that the jury is entitled to consider this fact when determining the credibility of any witness called to testify in this matter; and (2) that the court award attorneys fees and costs to the plaintiff that are attributable to the defendant's discovery abuses in this case. *See Juniper Networks, Inc. v. Toshiba Am., Inc.*, 2007 U.S. Dist. LEXIS 50096, 12-13 (E.D. Tx. 2007) (Hon. T. John Ward).

Respectfully submitted,

/s/ Margaret A. Harris
Margaret A. Harris*
State Bar No. 09081400
1007 Heights Boulevard
Houston, Texas  77008
(713) 526-5677
(713) 526-5691 Fax

*Attorney in charge for the plaintiff

Thomas A. Peterson
State Bar No. 15842900
595 Orleans, Suite 1111
Beaumont, Texas 77701
(409)838-6144
(409)838-4421 Facsimile

**Certificate of Conference**

I certify that I first tried to resolve this problem by asking the City to designate someone with knowledge. I set forth my position in writing in a letter to Mr. Joseph Sanders, lead counsel for the City, dated January 8, 2008, a copy of which is attached hereto as Ex. D. Mr. Sanders responded by letter dated January 11, 2008, and a copy of his letter is attached hereto as Ex. E. Mr. Sanders, rather than agreeing that his client would produce a witness with knowledge to testify on its behalf, instead suggested that I take the deposition of an unknown number of individuals. This suggestion did not fulfill the City's obligations under Rule 30(b)(6). Also, on February 21, 2008, I discussed this matter with Mr. Joseph Sanders, lead counsel for the City of

Beaumont, by telephone. I asked whether he would be willing to agree that the City should not be allowed to introduce any evidence regarding the rationale it used when making the decisions as to who would fill the various detective positions discussed in the Rule 30(b)(6) deposition. He said he was not agreeable to that suggestion, and that he opposed to the motion and the relief sought.

                                                                                   /s/ Margaret A. Harris

### Certificate of Service

I certify that a true and correct copy of this document has been served upon all counsel on February 25, 2008, because they are registered users of the Court's electronic filing system and this document is being filed by electronic filing with the U.S. District Court for the Eastern District of Texas.

                                                                                    /s/ Margaret A. Harris